**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| EDWARD L. FLANDERS, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 12-1481 |
| | ) | Hon. Nora Barry Fischer |
| FRED DZUGAN, *an adult individual, and* | ) | |
| FORD CITY BOROUGH, *a Pennsylvania* | ) | |
| *Municipal Corporation*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OPINION

## I.  INTRODUCTION

In this action, Plaintiff Edward L. Flanders, Jr. has sued Defendants Fred Dzugan and

Ford City Borough for alleged civil rights violations related to Flanders' unsuccessful attempt to

construct an addition to his business premises.  Presently pending before the Court is a motion

for summary judgment (Docket No. 102) filed by the Defendants.  For the reasons that follow,

the motion will be granted, in part and denied, in part.

## II.  FACTUAL, LEGAL, AND PROCEDURAL BACKGROUND[1]

A.  The Pennsylvania Construction Code Act and Uniform Construction Code

In 1999, the Commonwealth's General Assembly enacted the Pennsylvania Construction

Code Act ("PCCA").  *See* Act of November 10, 1999, P.L. 491, as amended, 35 Pa. Stat. Ann.

§§7210.101–7210.1103 (West).  Among other things, the PCCA was intended "to insure

---

[1] The factual background is derived from the undisputed evidence of record and the disputed evidence of record
viewed in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255
(1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his
favor.")

uniform, modern construction standards and regulations throughout the Commonwealth for the protection of life, health and property and for the safety and welfare of consumers, the general public and the owners and occupants of buildings and structures." *Schuylkill Twp. v. Pennsylvania Builders Ass'n*, 935 A.2d 575, 577 (Pa. Commw. Ct. 2007) (citing 35 Pa. Stat. Ann. §7210.102) (West)) (footnote omitted), *aff'd* 7A.3d 249 (Pa. 2010). To that end, Section 301(a)(1) of the PCCA directed the Department of Labor and Industry (the "Department") to adopt, by regulation, "the 1999 BOCA National Building Code, Fourteenth Edition, as a Uniform Construction Code." 35 Pa. Stat. Ann. § 7210.301(a)(1) (West). The Department did so, and the Commonwealth's Uniform Construction Code ("UCC") provisions are now codified at Title 34 of the Pennsylvania Code, Part XIV. *See* 34 Pa. Code. §§401.1 *et seq.*

"The [PCCA] applies generally to the construction, alteration, repair and occupancy of all buildings in the Commonwealth and preempts the establishment of different construction standards by local ordinance." *Schuylkill Twp.,* 935 A.2d at 577 (citing 35 Pa. Stat. Ann. §7210.104(a) and (d)). Municipalities may, however, enact ordinances that equal or exceed the minimum requirements of the UCC, subject to review by the Department and the right of an aggrieved party to challenge the ordinance. *See* 35 Pa. Stat. Ann. §7210.503 (West); *Schuylkill Twp.*, 935 A.3d at 577. In addition, the PCCA gives municipalities various options relative to the administration and enforcement of the Act, including the option to administer and enforce the provisions of the Act themselves through appointment of a municipal code official. *See* 35 Pa. Stat. Ann. §7210.501(b)(1). Where a municipality elects self-enforcement, it is statutorily required to establish a board of appeals to hear appeals from the decisions of its code administrator. *Id*. at §7210.501(c)(1). Members of the municipality's governing body may not serve as members of the board of appeals. *Id*.

2

On June 28, 2004, Ford City Borough (hereafter, the "Borough") passed Ordinance 657, by which it adopted Pennsylvania's UCC as the municipality's official building code, effective July 8, 2004. (*See* Defs.' Ex. W, Docket No. 104-23.) Through Ordinance 657, the Borough also elected to self-administer and enforce the provisions of the PCCA. (*Id.*)

B. Interactions Between Plaintiff and the Defendants

During times relevant to this lawsuit, Dzugan was employed by the Borough as its Building Code Official or "BCO." (Dzugan Dep. 11:15-17:6, Docket No. 130.) In this capacity, Dzugan was responsible for administering and enforcing provisions of the UCC. (*Id.* at 12:5-18, 13:11-17, 16:10-15.)

Flanders is the owner and operator of "ELF Appliance & Service," a business that engages in the sale and servicing of home appliances. The business is located in the Borough at 235 Main Street. (CSMF ¶¶ 1-2, 39.)[2]

On July 28, 2005, Flanders, seeking to construct a 10' x 54' addition onto his existing commercial building, submitted an "Application for Permit to Erect a New Building or Structure" to Dzugan. (CSMF at ¶¶ 3-4, 40.) The permit application, which was filled out by Dzugan and signed by Flanders, contained a notation that the estimated cost of the project was $3,000. (*Id.* at ¶¶ 4-5.)

Dzugan subsequently issued a permit, which was signed by Flanders on August 3, 2005. (CSMF ¶8.) Attached to the permit was Dzugan's own hand-drawn sketch of the proposed footer and foundation, which Dzugan had created at some point after receiving the application. (*Id.* at ¶¶ 7, 42). After submitting his permit application, Flanders learned for the first time that a

---

[2] Citations to "CSMF ¶___" refer collectively to the Defendants' Concise Statement of Material Facts in Support of Motion for Summary Judgment (Docket No. 105), Plaintiff's Responsive Concise Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment (Docket No. 112), and Defendants' Response to Plaintiff's Concise Statement of Additional Material Facts (Docket No. 120).

permit was being issued only for the footer and foundation of his new addition and that he would need to apply for a second building permit before finishing construction. (*Id.* at ¶ 9.)

On or about August 19, 2006, after constructing the footer and foundation and purchasing certain materials for the upper part of the addition, Flanders contacted Dzugan to apply for the second permit. (*Id.* ¶¶ 10-11, 43.) Dzugan inspected the property on August 21, 2006 and informed Plaintiff that he should submit a hand-drawn sketch of the proposed addition with the permit application. (*Id.* at ¶¶ 12, 44.) Three days later, however, Dzugan reversed himself in a letter dated August 24, 2006. In relevant part, the letter stated that:

> any building permit for a commercial building cannot be written until you have submitted three sets of signed and sealed blue prints from a Pa. Certified architect or engineer. These will be plan reviewed by a third party agency, returned to me and then I can write you a building permit. This is governed by Section 106 of the IBC 2003 International Building Codes.[3]
>
> I know I wrote you a permit for the foundation for your addition which is already completed, but the IBC was adopted since this and new rules are required by the State of Pa.[4] You must meet accessibility issues for the public.
>
> A building official is authorized to waive the submission of construction documents if the work is minor in nature, however yours is not because of the structural loads to be determined.

(Def.s' Ex. B, Docket No. 104-2.)

Notwithstanding this letter, Flanders submitted his second permit application along with only a hand-drawn sketch, which Dzugan refused to accept. (CSMF ¶15.) Concerned about deterioration of the materials in place and the possibility that runoff from the foundation might flood his business premises, Flanders proceeded to frame the addition sometime in the fall of

---

[3] Pennsylvania's UCC incorporates by reference a number of model codes, including the International Residential Code ("IRC") and portions of the International Building Code ("IBC"). *See Schuylkill Twp. v. Pennsylvania Builders Ass'n*, 935 A.2d 575, 578 n.3 and n. 6 (Pa. Commw. Ct. 2007) (citing 34 Pa. Code § 403.21), *aff'd*, 7 A.3d 249 (Pa. 2010). The IRC regulates the construction of residential buildings, and the IBC "regulates the construction of all other buildings except one and two-family dwellings covered by the IRC." *Id.* at 578 n.6.

[4] This statement would appear to be inaccurate, since the Borough had adopted the UCC, and any model codes incorporated therein, with the enactment of Ordinance 657 in 2004.

2006, despite his lack of a second building permit. (CSMF ¶¶ 16, 46.) Although Flanders had borrowed $12,000 for construction of the addition, this sum was not sufficient to pay for professionally drafted blueprints, which Flanders estimated would cost between $5,500 and $20,000. (*Id*. at ¶¶ 17, 47.)

On September 27, 2006 Dzugan issued a Stop Work Order to Flanders. (CSMF ¶ 18). When Flanders refused to sign the Order and stop construction, Dzugan issued a Non-Traffic citation that same day (hereafter, "Citation #1"), charging Flanders with violating Ordinance 657, the PCCA, and the August 24, 2006 directive to submit blueprints. (*Id*. at ¶ 19, Defs.' Ex. P, Docket No. 104-16.) Flanders does not dispute that Dzugan had probable cause for issuing this first citation. (*See* Pl.'s Mem. Opp. Mot. Summ. J. at 25 n.5, Docket No. 111; Oral Arg. Tr. 20:21-23 July 10, 2015, Docket No. 133.)

On October 30, 2006, Flanders received a letter from Dzugan advising him that a new sign leaning against his building was in violation of Borough Code because of its size. Thereafter, Flanders advised Dzugan that this sign was ELF Appliance's original sign, which had been removed from the original structure and was now leaning against the addition until it could be properly rehung. (CSMF ¶¶ 20, 48.) Flanders had purchased the commercial property in or around the mid-1990s, and the sign had been hanging on Flanders' building since shortly thereafter. (*Id*. at ¶49.) Nevertheless, on November 13, 2006 Dzugan issued a second Non-Traffic citation ("Citation #2") to Flanders, charging him with violating the Borough Code for failing to comply with the October 30, 2006 letter regarding the sign. (*Id*. at ¶ 21.)

A consolidated hearing was held on February 13, 2007 in front of Magisterial District Judge Michael L. Gerheim for Citations #1 and #2. (CSMF ¶ 22.) Flanders was found guilty of the first citation and fined $1,059; he was found not guilty of the second citation. (*Id.*) With

regard to Citation #1, Magisterial District Judge Gerheim offered Flanders an opportunity to submit blueprints within one month's time, in which case his fine would be reduced to $350; however, Flanders opted to pay the full fine "under protest" rather than acquire the blueprints or appeal the District Judge's decision. (*Id.* at ¶¶ 23-24).[5]

On September 26, 2007, Dzugan issued Flanders a third citation ("Citation #3") for failing to comply with the Magisterial District Judge's order to produce the blueprints. (CSMF ¶¶ 25, 53). At this point, Flanders pursued two separate challenges to Citation #3.

On the civil side, Flanders appealed Citation #3 to the Borough's UCC Board of Appeals (hereafter, the "Board" or "Board of Appeals"). On or around February 5, 2008, the Board issued an order denying the appeal and affirming Dzugan's denial of a building permit. (*Id.* at ¶¶ 26-27, 54-55). Flanders then appealed the Board's ruling to the Court of Common Pleas of Armstrong County. (*Id.* at ¶¶ 28, 56.) Despite noting the "avalanche of errors" that had led to the subject appeal (Pl.'s Ex. I at p. 5, Docket No. 113),[6] the court ultimately affirmed the Board's ruling. (CSMF ¶¶ 29, 57.) Flanders then appealed the ruling of the Court of Common Pleas to the Commonwealth Court. (*Id.* at ¶30.) Flanders' "principal contention," as paraphrased by the Commonwealth Court, was that, "because the Borough's Construction Code Administrator committed numerous procedural errors, which were not addressed or corrected, either by the Board or by the trial court, he is entitled to the permit." *Flanders v. Ford City Borough,* 986

---

[5] Flanders avers, and Defendants do not dispute, that Dzugan never advised Flanders of his right to appeal adverse decisions relative to Flanders' alleged lack of compliance with provisions of the UCC or other laws. (CSMF ¶ 51.)

[6] These "errors" included the fact that Dzugan had waived the UCC's blueprint requirement for the footer and foundation of the addition "without legal authority to do so," (*see* Pl.'s Ex. I at p. 5, Docket No. 113), and had initially told Flanders that hand-sketched plans would be acceptable for the second permit application as well, before "chang[ing] his mind" several days later. (*See id.* at p. 6.) The court also faulted Dzugan for issuing Citation #3 based on Flanders' failure to comply with Magisterial District Judge Gerheim's order to obtain blueprints; in this regard, the court noted that "failure to abide by an order of a Magisterial District Judge cannot possibly be a violation of the Ordinance." (*Id.* at p. 6.)

A.2d 964, 966 (Pa. Commonw. Ct. 2009). Finding no merit to this claim, the Commonwealth

Court wrote:

> the essential problem with Flanders' contention that he has a vested right to a building permit is that he was never issued a building permit. One may show a vested right to a building permit received in good faith. *Gallagher v. Building Inspector of City of Erie*, 432 Pa. 301, 303, 247 A.2d 572, 573 (1968). The issue here is not a matter of whether Flanders acted in good faith or bad faith. The issue is whether he had a building permit based upon an "oral" application, and the record supports only one conclusion: he did not.
>
> Nevertheless, Flanders makes a compelling argument that to require him to spend $5,000 to $14,000 on blueprints for a project expected to cost $8,000 to construct is unfair and extreme. He has a remedy. The Uniform Construction Code authorizes a municipal construction code board of appeals to grant a variance. 34 Pa.Code § 403.43(i).

*Flanders,* 986 A.2d at 969.

On the criminal side, Flanders pleaded not guilty to the charges set forth in Citation #3,

but he was convicted by Magisterial District Judge Gerheim on February 7, 2008. (CSMF ¶60.)

Flanders then appealed his conviction to the Armstrong County Court of Common Pleas. (*Id.*)

Eventually, on February 1, 2011, the Armstrong County Court of Common Pleas entered an

order, with the consent of the District Attorney, sustaining the appeal and finding Flanders not

guilty of the charges set forth in Citation #3. (*Id.* at ¶61.)

Having failed to obtain a permit through his civil proceedings relative to Citation #3,

Flanders next sought a variance. By letter dated August 27, 2010, Flanders' counsel advised the

Borough's solicitor, Frank Wolfe, that "Flanders...[had] sought, without success to schedule a

variance hearing as per the recent Commonwealth Court decision," but the "Borough Council

[had] decline[d] to do so." (Pl.'s Ex. R, Docket No. 113.) Through his counsel, Flanders

demanded that he be provided the appropriate forms and that a hearing be scheduled. (*Id.*)

Eventually, on February 8, 2011, a hearing was held before the Board of Appeals, which

consisted of Chairman Carl Waugaman and Board members Joseph Krukar, John Morris,

Randall Morris, Robert Swarts, and George Wick. (Pl.'s Ex. JJ, Docket No. 124.) Both Flanders and Dzugan appeared at the hearing. (Id.) After receiving evidence, the Board adjourned and then reconvened on March 24, 2011, at which time it denied Flanders' request for a variance.[7] (Pl.'s Supp. Appendix Ex. A, Docket No. 139-1.)

In the meantime, by correspondence dated December 8, 2010, Dzugan had notified Flanders that he would have thirty (30) days in which to either provide the required blueprints in support of his construction permit or obtain a demolition permit for the partially constructed addition. (Def.s' Ex. Z, Docket No. 104-26.) This was followed by a fourth citation ("Citation #4), issued on January 14, 2011, in which Dzugan charged Flanders with violating the Uniform Construction Code based on Flanders' failure to obtain either the blueprints or a demolition permit within the prescribed 30-day period. (CSMF at ¶ 34.)

Flanders subsequently applied for a demolition permit on April 4, 2011, and one was issued the following day for the "10' x 52' addition" at "237 Main Street" (Flanders' home address) rather than at 235 Main Street (his business address). (CSMF ¶¶ 35 and 63-64; Oral Arg. Tr. 12:14-17.) That same day (April 5, 2011), Flanders requested, and received, a new demolition permit reflecting the correct address of his business. (CSMF ¶35; Def.s' Ex. K, Docket No. 104-11.)

On June 10, 2011, Magisterial District Judge James Andring found Flanders guilty of the offenses set forth in Citation #4. (CSMF ¶36.) Flanders appealed this conviction to the Court of Common Pleas and, on August 29, 2011, Ford City consented to the dismissal of the citation. (CSMF 105 ¶¶ 36-37; Oral Arg. Tr. 10:22-25.)

---

[7] Chairman Waugaman abstained from voting; however, all other members of the Board voted to deny the variance. (*See generally* Pl.'s Supp. Appendix Ex. A, Docket No. 139-1.)

Several months later, on November 22, 2011, Dzugan issued an Order to Vacate that was posted on Flanders' premises. (CSMF ¶ 38.) This notice stated, in relevant part, as follows:

> On April 4, 2011, you [Flanders] were issued a permit for the demolition of your new addition. Permit number was #11-1177 and was paid for by check number 2805 on 4-12-2011 for the amount of ninety-two (92.00) dollars.
>
> [UCC] Section 403.43(g) states that a permit becomes invalid unless the authorized construction work begins within 180 days after the permits [sic] issuance. Your permit expired on Sept. 30, 2011. Section 403.84, Unsafe [B]uilding, Structure or Equipment, dictates the ordering to vacate the building.
>
> Therefore, under section 403.84(a), your structure is determined to be unsafe because there are no blueprints or building permits, there is an illegal or improper occupancy, and it poses other dangers to human life or the public welfare. This building determined [sic] by the Board of Appeals, is also an uncertified building.
>
> As the BCO, under Section 403.84(b), I have no choice but to order you to vacate your complete building known as Elf Appliance.

(Def.s' Ex. V, Docket No. 104-22.)

It is undisputed that the Order to Vacate has never been acted upon by Dzugan, and Flanders continues to operate his business in his original building. (Oral Arg. Tr. 14:2-5.) The addition thus remains partially-built and has been neither used nor demolished. (*Id*. at 29:8-11).

## C. Dzugan's History With the Department of Labor & Industry

As a certified UCC Building Code Official, Dzugan - though employed by the Borough - was subject to oversight by the Commonwealth's Department of Labor and Industry relative to his enforcement of the UCC and the PCCA. *See* 35 Pa. Stat. Ann. §7210.105(a) (West). Starting in 2006, Dzugan received a series of warning letters from the Department concerning his failure to properly enforce provisions of the UCC and the PCCA. (*Id*. ¶¶ 69-73.)

On July 7, 2006, the Department issued Dzugan a warning letter after Dzugan performed accessibility inspections on three commercial construction projects. The Department concluded that Dzugan was not certified as an "Accessibility Inspector/Plans Examiner," and it admonished

Dzugan "not [to] be involved (in <u>any</u> capacity) with the enforcement of the accessibility requirements of the UCC," until re-acquiring the necessary certification. (Pl.'s Ex. N, Doc. No. 113 (emphasis in the original).)

On April 24, 2007, Dzugan received another warning letter from the Department concerning his initial issuance of a building permit to Flanders. The Department found that Dzugan violated §403.42a of the UCC in that "[n]o construction documents were reviewed or approved prior to the issuance of a building permit." (Def.s' Ex. U, Docket No. 104-21.) The letter noted that, per §403.42a of the Code,

> [a] permit applicant shall submit an application to the building code official and attach construction documents, including plans and specifications, and information concerning special inspection and structural observation programs, Department of Transportation highway access permits and other data required by the building code official with the permit application. The applicant shall submit three sets of documents when the Department conducts the review.

(*Id.*)

The following July, Dzugan received a warning concerning his involvement with an establishment known as "Jitterbug Java." The Department found Dzugan had improperly allowed this former residential property to be converted into a commercial property without the submission, review, or approval of necessary sealed drawings or construction documents. (Pl.'s Ex. O at ¶16 and Ex. Y, Docket No. 113.) In addition, Dzugan had knowingly allowed a ramp to be constructed while lacking any certification to review or inspect the project concerning accessibility issues. (*Id.*) Dzugan had also issued a temporary certificate of occupancy to Jitterbug Java on September 1, 2006, when it was not permissible to do so, and had allowed the temporary certificate to remain in effect until at least April 7, 2011 before requiring the owners to submit professional drawings and secure permits. (Id.)

On March 30, 2009, Dzugan received additional warnings from the Department concerning three separate complaints. The warnings related, in part, to Dzugan's conduct in allowing a third party agency to conduct plan reviews of proposed projects when the third party had not been retained by the Borough to do so. (Pl.'s Ex. O at ¶¶17-18, Docket No. 113.) The warnings also faulted Dzugan for failing to approve or deny plans and failing to issue a stop work order and/or a notice of violation when he determined that construction had begun without a permit or approved plans. (*Id.*)

The Department ultimately issued an Order on February 7, 2011 directing Dzugan to show cause why his certifications should not be revoked in light of additional complaints that had been filed with regard to his involvement in three other properties, known as the "Mantini Building," "Lerner Photography," and "Gregg's Garage." (Pl.'s Ex. O, Docket No. 113.)

The first complaint concerned an application by Jeffrey and Eric Mantini to undertake alterations to their previously constructed building. (CSMF ¶103.) The Department's investigator determined that Dzugan had approved the plans submitted for the building construction, plumbing work, and mechanical work and had issued a certificate of occupancy, despite lacking certification as a building plans examiner, plumbing plans examiner, or mechanical plans examiner. (Id. at ¶¶ 104-105; Pl.'s Ex. O).

The second complaint concerned Lerner Photography, a former church in Ford City that was converted into a commercial photography studio and thus involved a change in occupancy. (CSMF ¶ 77.) The Department's investigator found that Dzugan had improperly allowed construction to commence on this project without the required building plans having been submitted, a permit having been obtained, and the necessary inspections having been conducted. (Pl.'s Ex. O; CSMF at ¶¶ 78-82.) The Department also found that Dzugan failed to issue a stop

work order after he knew or should have known that construction was occurring without the required permits. (CSMF at ¶ 83; Pl.'s Ex. O.)

The third complaint concerned Gregg's Garage, a property that was owned by Gregg Dinko, a former Mayor of Ford City and then-Chairman of the Borough's Zoning Board. (CSMF ¶ 84, Pl.'s Ex. FF, Docket No. 113.) The record shows that, on August 10, 2010, Dzugan notified Dinko that the foundation of his garage, which was starting to collapse, was a safety issue of concern to the Borough. (Pl.'s Exs. O and T, Docket No. 113.) Dzugan instructed Dinko to seek the assistance of a licensed engineer or architect and apply for the necessary permits, so that he could begin repairs to the building. (Id.) On October 4, 2010, the Department received a complaint against Dzugan for refusing to enforce the PCCA and the UCC relative to Gregg's Garage, and an investigation ensued. (Pl.'s Ex. O, ¶¶ 105-06.) Dzugan sent a second letter to Dinko on October 20, 2010 in which he noted that he was still awaiting an engineering assessment of the damage to the foundation. Dzugan requested that, in the meantime, Dinko submit a timeline for repairs, and he noted that the UCC's provision on "Unsafe Structures" could be enforced. (Pl.'s Ex. U, Docket No. 113.) On November 10, 2010, David G. Nichols, a local engineer submitted a letter report to the Borough's Council indicating that the existing foundation for Gregg's Garage had failed structural tests and that a substantial sinkhole existed in the front of the doors facing an entrance. (Def.s' Ex. E, Docket No. 104-5.) In his correspondence, Mr. Nichols recounted Dinko's "verbal commitment to provide a time schedule for demolition of the existing building and the construction of a new building while aggressively maintaining protective barriers and signs to curtain away the public from the front of his building." (Id.) Dzugan followed up by posting a notice on the front door of Gregg's Garage, dated November 24, 2010, which asked Dinko to aggressively maintain protective barriers and

signs so as to curtain away the public from the front of the building. (Pl.'s Exs. O and V, Docket No. 113.) Nine days later, on December 3, 2010, an official from the Department instructed Dzugan to order the building vacated and post a notice prohibiting its occupancy in accordance with the UCC. Dzugan was warned that failure to follow through with his responsibilities as BCO could result in the Department taking further action against him. (Pl.'s Ex. O, ¶110, Docket No. 113.) Nevertheless, in its February 7, 2011 Show Cause Order, the Department noted that Dzugan had failed to take any further action relative to Gregg's Garage. The Department found that Dzugan had violated his responsibilities under the PCCA and/or UCC by failing to order that the building be vacated and demolished. (Pl.'s Ex. O at ¶¶ 114-118.) On September 1, 2011, the Borough's Mayor wrote a letter to Dzugan complaining about the lack of enforcement and requesting an update on the status of Gregg's Garage. Thereafter, on November 1, 2011, Dzugan posted an Order to Vacate at Gregg's Garage. (Pl.'s Ex. X, Docket No. 113.) On November 22, 2011, he issued a citation to Dinko as a result of his "failure to remove or remedy the nuisance of an unsafe structure." (Id.)

Eventually, Dzugan and the Department entered into a Settlement Agreement and Order on November 4, 2011, pursuant to which Dzugan's Building Code Official Certification was revoked for a period of two (2) years. (CSMF ¶75; Pl.'s Ex. P, Docket No. 113.) Despite this revocation of his BCO certification, Dzugan retained his certifications as a residential building inspector, a residential electrical inspector, a residential plumbing inspector, an electrical inspector, and an electrical plans examiner under the PCCA and the UCC. (Pl.'s Ex. EE, ¶¶ 1 and 4, Docket No. 113.) However, on April 26, 2012, the Department issued a second order directing Dzugan to show cause why he should not be decertified as a code administrator. (Pl.'s Ex. EE.)

The second Show Cause Order stemmed from Dzugan's actions relative to a permit application filed by William and Carrie Andrews in August 2009 for the construction of a new single family dwelling to be located in Avonmore, Pennsylvania.  (Pl.'s Ex. EE, Docket No. 113.)  According to the Department, Dzugan granted the building permit on September 1, 2009 and issued a certificate of occupancy on June 28, 2010.  (Id. at ¶¶ 15, 21.)  The Department found that, at the time the certificate of occupancy was issued, the Andrews' house had not been completed and all of the required inspections had not been conducted.  (Id. at ¶23.)  At some point after June 28, 2010, Dzugan manufactured a temporary certificate of occupancy by handwriting the word "Temp" on the previously issued occupancy permit.  (Id. at ¶24.)  The Department determined that even the temporary certificate of occupancy was improper in that none of the permitted construction on the Andrews' house was yet complete and no section of the house was safe for occupation.  (Id. at ¶26.)  The Department's investigator found that the construction of the house did not comply with the UCC or the approved plans.  (Id. at ¶29.)  Moreover, Dzugan had failed to set the time period for which the temporary certificate of occupancy was valid.  (Id. at ¶26.)

The record does not disclose the outcome of Dzugan's second Show Cause Order by the Department.  What is established, however, is that Dzugan's employment with the Borough ended when he resigned in March 2012, following the suspension of his BCO certification.  (Dzugan Dep. at16:23-17:6, Docket No. 130.)

D.  The Instant Lawsuit

Flanders commenced this lawsuit by filing a writ of summons on April 20, 2012 in the Armstrong County Court of Common Pleas.  (*See* Notice of Removal ¶2, Docket No. 1.) Thereafter, the matter was removed to this Court.[8]  (*See generally id.*)

On May 7, 2013, Flanders filed his Amended Complaint (Docket No. 22), which is the operative pleading in this case.  Counts I and II assert claims based on the alleged violation of Flanders' substantive due process rights as guaranteed under Pennsylvania's Constitution and the U.S. Constitution, respectively.  Count III asserts that Defendants retaliated against Flanders because of his having exercised rights protected by the state and federal Constitutions.  Counts IV and V respectively assert claims based on the alleged violation of Flanders' right to equal protection under the law, as guaranteed by Pennsylvania's Constitution and the U.S. Constitution.  Count VI asserts a Pennsylvania state law claim for malicious prosecution based on the various citations issued by Dzugan.

Defendants filed their pending motion for summary judgment on all counts (Docket No. 102) on May 1, 2015.  The parties have engaged in extensive briefing and have submitted their respective materials in support of, and in opposition to, the pending motion.  (*See generally* Docket Nos. 103, 104, 105, 111, 112, 113, 119, 120, 123, 124, 130, 131, 134, 135, 138, 139.)  In addition, this Court entertained oral argument on July 10, 2015.  (*See* Oral Arg. Tr., Docket No. 133.)  As a result of the foregoing proceedings, the record has been sufficiently developed and the issues sufficiently joined such that the Defendants' motion is now ripe for adjudication.

---

[8] The Court's subject matter jurisdiction over the original complaint was premised on 28 U.S.C. §§1331 and 1441. Its supplemental jurisdiction over Flanders' later-added state law claims exists pursuant to 28 U.S.C.§1367.

### III. STANDARD OF REVIEW

It is well-established that summary judgment is appropriately entered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it might affect the outcome of the suit under the governing law." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir.2013) (citation omitted). A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the Court's function is not to weigh the evidence, to determine the truth of the matter, or to evaluate credibility. *See Montone v. City of Jersey City*, 709 F.3d 181 (3d Cir. 2013). Rather, the Court is only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *Id*. In evaluating the evidence, the Court must interpret the facts in the light most favorable to Plaintiff and draw all reasonable inferences in his favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

### IV. DISCUSSION

A. Flanders' §1983 Claims

Counts II, III and V of the Amended Complaint involve claims asserted under 42 U.S.C. §1983 for the alleged violation of Flanders' federal constitutional rights. To establish a claim under §1983, a plaintiff must demonstrate the violation of a right secured by the Constitution or laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law. *Lomax v. U.S. Senate Armed Forces Service Committee,* 454 F. App'x 93, 95 (3d Cir.2011) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)). Because municipalities and other local government units may be "persons" liable under §1983, *see*

16

*Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 690–91 (1978), and because there is no question that Dzugan was acting under color of state law at all relevant times, the Court's analysis will focus on whether Flanders has adduced evidence sufficient to establish an actionable deprivation of his federal constitutional rights. In this case, Flanders claims that Defendants violated: (i) his right to substantive due process, (ii) his right to engage in constitutionally protected activity free from retaliation, and (iii) his right to equal protection under the law.

Defendants contend that Flanders has failed to produce evidence of an actionable constitutional violation. They contend that many of the events upon which Flanders' claims are premised are outside of the relevant statute of limitations, making his §1983 claims untimely. They further argue that the evidence fails to establish all requisite elements of Flanders' various constitutional tort theories. Even assuming that a constitutional violation can be established, Defendants contend that Dzugan is entitled to qualified immunity. Finally, Defendants argue that the record does not support a viable municipal liability claim against the Borough. The Court will address these defenses as they pertain to Flanders' various §1983 claims.

### 1. *Substantive Due Process*

In Count II of the Amended Complaint, Flanders asserts the violation of his substantive due process rights. "[T]he touchstone of due process is protection of the individual against arbitrary action of government." *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (internal quotation marks and citation omitted). "[W]here the challenge is to executive rather than legislative action, 'only the most egregious official conduct can be said to be arbitrary in the constitutional sense.'" *Nicini v. Morra*, 212 F.3d 798, 810 (3d Cir. 2000) (*en banc*) (quoting *Lewis*, 523 U.S. at 846); *see Gottlieb v. Laurel Highlands Sch. Dist.*, 272 F.3d 168, 172 (3d Cir.

2001) (substantive due process is violated when state conduct is "'arbitrary, or conscience shocking, in a constitutional sense'") (quoting *Lewis*, 523 U.S. at 847).  Thus, to establish a substantive due process claim under §1983, a plaintiff must prove that:  (1) the particular interest at issue is protected by the Fourteenth Amendment, and (2) the government's deprivation of that protected interest shocks the conscience.  *Connection Training Serv. v. City of Phila.*, 358 F. App'x 315, 319 (3d Cir. 2009).  The substantive due process clause protects only "those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty such that neither liberty nor justice would exist if they were sacrificed."  *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (internal quotations omitted).  "If the asserted interest is not fundamental, the government action complained of is not covered by the substantive due process clause and 'will be upheld so long as the state satisfies the requirements of procedural due process.'"  *Ruiz v. Strange*, No. CV 15-2112, 2015 WL 7734131, at *5 (E.D. Pa. Dec. 1, 2015) (quoting *Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 142 (3d Cir. 2000)).

Here, Flanders alleges that Defendants deprived him of his right "to acquire, possess and protect his interest in the property in which he maintained his business..."  (Amended Compl. ¶66, Docket No. 22.)  Flanders avers that Defendants deprived him of this protected property interest by:

(1) failing to issue the building permit(s);

(2) criminally prosecuting [him];

(3) failing to properly issue the demolition permit;

(4) issuing the Order to Vacate [his] building at 235 Main Street...and

(5) not correcting their errors.

(*Id.* ¶67; *see also* Pl.'s Mem. Opp. to Def.s' Mot. Summ. J. at 10-11, Docket No. 111.)  In his brief in opposition to the pending motion, Flanders highlights additional conduct that, he claims, evidences a violation of his rights, namely:  (a) Dzugan's refusal to accept a hand-drawn sketch for the completion of the addition; (b) Dzugan's failure to notify Flanders of his right to appeal adverse decisions; (c) Dzugan's issuance of a stop-work order; (d) Defendants' failure to give Flanders written notice of the Appeals Board hearings; and (e) the Board's refusal to grant Flanders a variance.  (*See* Pl.'s Mem. Opp. to Def.s' Mot. Summ. J. at 4.)[9]

As Flanders correctly notes, an individual's ownership of real property implicates a "fundamental" property interest that is protected by substantive due process.  *See DeBlasio v. Zoning Board of Adjustment,* 53 F.3d 592 (3d Cir.1995), *overruled in non-relevant part by United Artists Theatre Circuit, Inc. v. Twp. of Warrington,* 316 F.3d 392 (2003); *Nicolette v. Caruso,* 315 F. Supp. 2d 710, 722 (W.D. Pa. 2003).  Thus, at all times relevant to this lawsuit, Flanders had a protected property interest in the premises wherein he conducted his business.[10]

Even so, Flanders has failed to produce evidence sufficient to establish an actionable deprivation of that interest.  To begin, many of the acts of which Flanders complains fail to

<hr>

[9] Flanders contends that his claims are based on the "cumulative effect" of these "continuing actions," rather than being based on "any one particular action taken by the Defendants."  (Pl.'s Mem. Opp. to Def.s' Mot. Summ. J. at 5, Docket No. 111.)  In characterizing his claims in this fashion, Flanders seeks to invoke the "continuing violation" doctrine, an equitable exception to the statute of limitations defense. *Gould v. Borough,* 615 F. App'x 112, 116 (3d Cir. 2015).  As explained below, however, the continuing violation doctrine does not permit Flanders to aggregate his claim in this fashion so as to evade the applicable statute of limitations on otherwise time-barred misconduct.

[10] By contrast, the Pennsylvania Commonwealth Court previously ruled that Flanders had no vested right to a construction permit under Pennsylvania law, *see Flanders v. Ford City Borough,* 986 A.2d 964, 966 (Pa. Commonw. Ct. 2009), so the permit itself cannot serve as the "property interest" of which Flanders was deprived.  Similarly, to the extent Flanders complains that Defendants interfered with his ability to run his business, this allegation cannot serve as the basis for a substantive due process claim, because Flanders did not have any constitutionally protected property interest in his business.  *See, e.g., Wrench Transp. Sys., Inc. v. Bradley,* 340 F. App'x. 812, 815 (3d Cir.2009) (finding no constitutionally protected substantive due process interest in the right to "engage in business"); *Hammond v. Contino,* No. CIV. 14-1042 RBK/AMD, 2014 WL 6388757, at *4 (D.N.J. Nov. 17, 2014) (plaintiff's allegations concerning "the demise" of his business and "the loss of business profits from its operation" failed to identify a constitutionally protected interest); *Chester Cnty. Aviation Holdings, Inc. v. Chester Cnty. Aviation Auth.,* 967 F. Supp. 2d 1098, 1107 (E.D. Pa. 2013) (dismissing plaintiff's substantive due process claim because there is no protected property interest in a company's ability to operate its business).

establish any deprivation of his protected property interest.  For example, neither Dzugan's
prosecution of Flanders for the non-traffic citations nor his initial issuance of the demolition
permit bearing an incorrect address deprived Flanders of his property interest.  Similarly, no
property deprivation occurred as the result of Dzugan's failure to notify Flanders of his right to
appeal and/or Dzugan's failure to give written notice concerning the Board of Appeals hearings.
Thus, these events do not support Flanders' substantive due process claim.

Moreover, certain acts which arguably *did* result in a deprivation of Flanders' property
are not actionable because they are time-barred.  It is well-established that Pennsylvania's two-
year statute of limitations for personal injuries, 42 Pa.C.S.A. § 5524, is applicable to a §1983
claim brought in a Pennsylvania federal court.  *See Mumma v.High-Spec, Inc*., 400 F. App'x 629,
631 (3d Cir. 2010) (citing *Wilson v. Garcia,* 471 U.S. 261, 266-67 (1985)).  Because this action
was commenced on April 20, 2012, Flanders' claims are barred to the extent they accrued prior
to April 20, 2010.  The accrual date for a §1983 claim is a question of federal law.  *Wallace v.
Kato*, 549 U.S. 384, 388 (2007).  As a general rule, accrual occurs "when the plaintiff has a
complete and present cause of action, ... that is, when the plaintiff can file suit and obtain relief."
*Id*. (internal quotation marks and citations omitted).  "An action under §1983 accrues 'when the
plaintiff knew or should have known of the injury upon which the action is based.'"  *Gould v.
Borough*, 615 F. App'x 112, 116 (3d Cir. 2015) (quoting *Montanez v. Sec'y Pa. Dep't of Corr*.,
773 F.3d 472, 480 (3d Cir.2014)).

Here, Flanders has alleged that the Defendants' failure to issue the building permit
resulted in a deprivation of his property to the extent that he could not complete the addition for

its intended use.[11]   However, Flanders was aware of this deprivation no later than February 5, 2008, the date on which he admits having received the decision of the Board of Appeals affirming Dzugan's denial of the permit.  (*See* Amended Compl. ¶32.)  Certainly, as of that date Flanders' claim against the Defendants was fully accrued, *see Gould,* 615 F. App'x at 117 (noting that the plaintiff "did not need to complete his appeal through the Pennsylvania judicial system before his § 1983 claims would accrue"); however, Flanders' claim was not asserted within the relevant 2-year statute of limitations period and, consequently, it is now time-barred. Similarly, any substantive due process claim that is premised on Dzugan's issuance of the September 2006 stop-work order is untimely.  Flanders was plainly aware of any constitutional injury arising from the stop-work order (insofar as it bore on his inability to complete the addition) as early as 2006, yet he failed to file his §1983 claim within the relevant limitations period.[12]

In his briefs opposing summary judgment, Flanders argues that the "continuing violation" doctrine renders his claim timely.  "This doctrine creates a 'narrow' and 'equitable exception to the timely filing requirement.'"  *Gould*, 615 F. App'x at 116 (quoting *Tearpock–Martini v. Borough of Shickshinny*, 756 F.3d 232, 236 (3d Cir. 2014)).  It holds that, "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period."  *Montanez v. Sec'y Pa. Dep't of Corr.*, 773 F.3d 472, 481 (3d Cir. 2014) (quoting *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir.

---

[11] Flanders' complaint that Dzugan refused to accept a hand-drawn sketch of the proposed addition is "part and parcel" of this complaint because, without professionally drawn blueprints, Dzugan would not process Flanders' application or issue a permit for the construction.

[12] The Court notes that, after Flanders refused to sign the stop-work order or cease construction, it became the basis for his first non-traffic citation.  Flanders was found guilty of the offenses set forth in Citation #1 in February 2007. Thus, even if Flanders had timely asserted a §1983 claim arising from Dzugan's issuance of the stop-work order, such a claim would likely be barred in light of Flanders' conviction relative to the offenses charged in Citation #1. *See Heck v. Humphrey,* 512 U.S. 477, 486-87 (1983).

2001)).  The doctrine applies only where the plaintiff can establish that the defendant's conduct is "more than the occurrence of isolated or sporadic acts." *Cowell,* 263 F.3d at 292.  Furthermore, because the doctrine "is not a substitute for a plaintiff's 'awareness of and duty to assert his/her rights' in a timely fashion," *Bennett v. Susquehanna Cty. Children & Youth Servs*., 592 F. App'x 81, 85 (3d Cir. 2014) (quoting *Cowell,* 263 F.3d at 295), it "'does not apply when plaintiffs are aware of the injury at the time it occurred.'" *Id*. (quoting *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C*., 331 F.3d 406, 417 n. 6 (3d Cir.2003)).  As noted, any deprivations of Flanders' constitutionally protected interest in his commercial property that resulted from:  (i) Dzugan's refusal to accept hand-drawn sketches as part of the permit application, (ii) Defendants' refusal to issue a construction permit, and/or (iii) Dzugan's issuance of the February 2006 stop work order were known to Flanders well before April of 2010; consequently, those claims are now time-barred and cannot be resuscitated through application of the continuing violations doctrine.  Nor can Flanders save these claims by alleging that Defendants have "not correct[ed] their errors."  (Amended Compl. ¶67; *see also* Pl.'s Mem. Opp. to Def.s' Mot. Summ. J. at 10.)  That is because "[a] continuing violation is occasioned by continual unlawful *acts*, not continual ill *effects* from the original violation."  *Bennett,* 592 F. App'x at 85 (citing *Cowell*, 263 F.3d at 293) (emphasis added).  "A government official's refusal to undo or correct a harm caused by the official's unlawful conduct is not an affirmative act for purposes of establishing a continuing violation."  *Gould,* 615 F. App'x at 116 (3d Cir. 2015) (quoting *Tearpock-Martini v. Borough of Shickshinny*, 756 F.3d 232, 236 (3d Cir. 2014)) (internal quotation marks and alterations omitted).

Notably, Flanders bases his substantive due process claim on two other events which appear to be timely, having occurred after April 20, 2010.  The first is the Board's refusal to

grant his request for a variance, which occurred in March 2011 following a hearing. (*See* Pl.'s

Ex. JJ, Docket No. 124; Pl.'s Suppl. Appendix Ex. A, Docket No. 139-1.) The second is

Dzugan's issuance of the November 2011 order to vacate. Flanders contends that this order was

overly broad inasmuch as it directed him to vacate his entire business premises rather than just

the portion of the premises involving the incomplete addition. (*See* Amended Compl. ¶55.)

Assuming that these events resulted in a deprivation of Flanders' property interest, the

Court finds that they are insufficient as a matter of law to support a viable §1983 claim because

neither of these events involved "conscience-shocking" conduct. *See United Artists Theatre*

*Circuit, Inc. v. Twp. of Warrington,* 316F.3d 392, 394 (3d Cir. 2003) (holding that a land use

regulation violates substantive due process only if it "shocks the conscience.") (citing *County of*

*Sacramento v. Lewis*, 523 U.S. 833 (1998)). This legal standard encompasses "only the most

egregious official conduct." *Id*. at 400. Although application of this standard is highly fact-

dependent, "[w]hat is clear is that this test is designed to avoid converting federal courts into

super zoning tribunals." *Eichenlaub v. Twp. of Indiana,* 385 F.3d 274, 285 (3d Cir. 2004). The

Third Circuit Court of Appeals has explained that:

> every appeal by a disappointed developer from an adverse ruling of the local
> planning board involves some claim of abuse of legal authority, but "[i]t is not
> enough simply to give these state law claims constitutional labels such as 'due
> process' or 'equal protection' in order to raise a substantial federal question under
> section 1983. ... Land-use decisions are matters of local concern, and such
> disputes should not be transformed into substantive due process claims based only
> on allegations that government officials acted with "improper" motives.

*United Artists,* 316 F.3d at 402 (quoting *Creative Environments, Inc. v. Estabrook*, 680 F.2d 822,

833 (1st Cir.1982)) (alterations in the original). The Court of Appeals has suggested that

conscience-shocking conduct may exist where there is evidence of "corruption or self-dealing,"

the hampering of development in order to intentionally interfere with constitutionally-protected

activity on the premises in question (such as legal abortion services), municipal action reflecting

"bias against an ethnic group," or a "virtual taking" of the claimant's property. *See Eichenlaub*, 385 F.3d at 285–86. On the other hand, the standard is not satisfied by allegations that an official applied certain regulations to one parcel of property and not to others, "pursued unannounced and unnecessary inspection and enforcement actions," "delayed certain permits and approvals," or "maligned and muzzled" the landowners. *Id*. at 286.

In this case, the evidence is insufficient to support a finding of conscience-shocking behavior relative to the Board's denial of a variance and/or Dzugan's issuance of the Order to Vacate. With regard to Flanders' request for a variance, the Court notes that the record includes the transcript from the Board's February 8, 2011 hearing, at which both Flanders and Dzugan appeared. (*See* Pl.'s Ex. JJ, Docket No. 124.) The record also includes the transcript from the Board's March 24, 2011 hearing, at which time the voting members of the Board unanimously agreed to deny Flanders' request for a variance. (*See* Pl.'s Suppl. Appendix Ex. A, Docket No. 139-1.) Notably, Flanders does not point to any specific aspect of these proceedings as supportive of his substantive due process claim, and this Court's review of the transcripts has revealed nothing unusual that would suggest even an improper motive on the part of the Board, much less conscience-shocking behavior. Although Flanders contends that there is "precedent" for the Board having granted variances to landowners in the past (*see* Oral Arg. Tr. at 28:6-8, citing Pl.'s Ex. GG, Docket No. 113), Flanders offers no evidence from which it can reasonably be concluded that the Board's decision to deny a variance in his case involved egregious or unconscionable conduct. *United Artists,* 316 F.3d at 400. In essence, Flanders' complaint about the denial of a variance represents nothing more than a garden-variety disagreement with a governing body's land-use decision—a matter which, as the Court of Appeals has admonished, is

of "local concern" and "should not be transformed into [a] substantive due process claim[]." *Id.*at 402.

With regard to the Order to Vacate, the record shows that Dzugan issued this order on November 22, 2011 without having first conducted an inspection of the property on that date; the notice was then posted on Flanders' premises. (CSMF ¶38.) The Order to Vacate was premised upon Dzugan's interpretation of UCC §403.84(a), pursuant to which Dzugan had deemed the unfinished addition to be "unsafe." (Def.s' Ex. V, Docket No. 104-22.) Specifically, the Order explained that the "structure is determined to be unsafe because there are no blueprints or building permits, there is an illegal or improper occupancy, and it poses other dangers to human life or the public welfare. This building ... is also an uncertified building." (Id.) Dzugan further explained at his deposition that the proposed addition was "a means of ingress, egress from the existing building. So, without there being drawings, without there being permits and inspections to make sure the structure is sound and meets code, it's determined by the UCC regulations to be unsafe." (Dzugan Dep. at 74:13-17, Docket No. 130.) Although Flanders contends that Dzugan wrongfully ordered him to vacate his entire building structure, rather than limiting the order to the addition at issue, he cites no authority to support his claim that the Order to Vacate was improperly issued. In any event, however, it is undisputed that the Order to Vacate was never acted on by Dzugan, and Flanders continues to operate his business in his original building. (Oral Arg. Tr. 14:2-5.) The addition remains partially-built and has been neither used nor demolished. (*Id*. at 29:8-11). Under these circumstances, even if Dzugan's Order to Vacate could be considered an act of property deprivation, his conduct in issuing the order does not rise to the level of conscience-shocking behavior. *See Mill v. Pocono Ranch Lands Property Owners Ass'n Inc.,* 557 F. App'x 141, 144-45 (3d Cir. 2014) (noting that claims that defendants applied

zoning requirements unfairly, pursued unnecessary enforcement actions, and delayed permits and approvals have failed to establish "conscience-shocking" conduct).

In an effort to meet this standard, Flanders argues that the record would support a finding of Dzugan acting with a "self-serving motive." (Oral Arg. Tr. at 32:21-33:11.) Flanders theorizes that, because Dzugan was being investigated during this time frame by the Department of Labor and Industry concerning his job performance, Dzugan was therefore motivated to "go[]" after Flanders" as part of "a campaign to show what he's able to do under the building code." (Id. at 33:3-4.)

The problem with this theory is that it is based entirely on speculation, as there is no evidence at all in the record that Dzugan acted on such a motive. The theory is also illogical. The evidence in this case suggests that Dzugan was under investigation by the Department for having failed to enforce various building code requirements strictly enough in certain cases, including Flanders'. (*See* Def.'s Ex. U, Docket No. 104-21.) Thus, to the extent Dzugan began to enforce those provisions more robustly relative to Flanders' proposed addition, this supports the conclusion that Dzugan was performing his public duties in a more capable and responsible fashion. Flanders' theory implausibly suggests that, by improving his job performance and carrying out his official responsibilities in accordance with the Department's directive, Dzugan engaged in egregious misconduct. Apart from being implausible, Flanders' theory also fails to recognize that an improper motive on the part of Dzugan, even if proven, would not suffice to establish a substantive due process violation. *See Chainey v. Street*, 523 F.3d 200, 220 (3d Cir. 2008) ("[M]erely alleging an improper motive is insufficient, even where the motive is unrelated to the merits of the underlying decision.") (citing *United Artists*, 316 F.3d at 400); *Maple Props., Inc. v. Twp. of Upper Providence*, 151 F. App'x 174, 180 (3d Cir. 2005) ("[T]he politics and

animosities that often animate local decision-making are not matters of constitutional concern.")

(citing *Eichenlaub*, 385 F.3d at 285–86).

In any event, the motive attributed to Dzugan under Flanders' theory does not involve the type of "self-dealing" or "corruption" that the Third Circuit Court of Appeals has suggested could support a viable substantive due process claim. In *Eichenlaub*, the court distinguished *Conroe Creosoting Co. v. Montgomery County*, 249 F.3d 337 (5th Cir.2001), a case in which the Fifth Circuit Court of Appeals had found a triable substantive due process claim. As the court explained in *Eichenlaub*:

> [*Conroe Creosoting*] was not a zoning dispute. Rather, plaintiffs charged that the officials fraudulently converted a tax levy for a $75,000 deficiency into an unauthorized seizure and forced sale and destruction of an $800,000 ongoing business. The principal defendant conceded that the sale was unauthorized. The facts carried a whiff of self-dealing, since the principal defendant's friends were alleged to have been engaged to perform auction services. In effect, the court found that the facts asserted amounted to a claim of an unconstitutional "taking" without just compensation, in violation of the Fifth Amendment, or an improper seizure, in violation of the Fourth Amendment. ...

*Eichenlaub*, 385 F.3d at 285. These facts, as described by the Third Circuit Court of Appeals, are materially distinguishable from the facts at issue here.

Flanders also attempts to establish corruption on the part of Dzugan by pointing to evidence that Dzugan did not aggressively enforce the applicable code provisions against Gregg Dinko, the owner of "Gregg's Garage." Because Dinko was a member of the Borough's zoning board and had previously served as the mayor of Ford City, Flanders infers that Dzugan treated Dinko more favorably because of Dinko's political ties. Even if such an inference were reasonable, however, the inference would in no way support the conclusion that Dzugan had corruptly effectuated a deprivation of *Flanders'* property interest. Nor is it sufficient for Flanders to simply allege that Dzugan treated other landowners differently. *See Eichenlaub,* 385

F.3d at 286 (landowners' assertion that zoning officials applied subdivision requirements to their property and not to other parcels failed to establish a substantive due process violation).

In sum, Flanders has failed to produce evidence of an actionable substantive due process violation. His failure to do so renders Count II of the Amended Complaint insufficient as a matter of law, and summary judgment will therefore be entered in favor of Defendants with respect to this claim.

### 2. Retaliation

In Count III of the Amended Complaint, Flanders asserts a §1983 claim based on Defendants' alleged retaliation against him for having engaged in rights protected by the United States Constitution. *See Miller v. Mitchell*, 598 F.3d 139, 147 (3d Cir. 2010) (noting that retaliation for the exercise of constitutionally protected rights "is itself a violation of rights secured by the Constitution actionable under section 1983") (internal quotation marks and citation omitted). Specifically, Flanders appears to be claiming that Defendants took retaliatory action against him because of the fact that he exercised his First Amendment right to petition for redress. (*See* Amended Compl. ¶73 (alleging that Flanders was "retaliated against by the Defendants for contesting the unfair actions of the Defendants").)

To establish the elements of his §1983 retaliation claim, Flanders must show "(1) that [he] engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). As to the first element of his claim, Flanders contends that he engaged in constitutionally protected activity when he "contest[ed] the unfair action of the Defendants through appeals of their decisions regarding his property." (*See* Pl.'s

Mem. Opp. Defs.' Mot. Summ. J. at 14, Docket No. 111.) Flanders notes that his protected actions "involved reporting the code enforcement officer's misfeasance to a legislative body and filing appeals to the court of common pleas." (*Id.*) This appears to be a reference, in part, to Flanders' January 28, 2008 hearing before the Board of Appeals, whereby Flanders contested Dzugan's denial of a building permit. Flanders also appears to be referencing his February 25, 2008 appeal to the Court of Common Pleas in which he challenged the Board's adverse ruling relative to the building permit. Flanders may also be referencing his February 19, 2008 appeal to the Court of Common Pleas in which he challenged his conviction relative to Citation #3. Defendants do not dispute that the foregoing constitutes constitutionally protected activity.

With regard to the second element of Flanders' claim, the Court notes that the precise nature and scope of the alleged retaliatory acts is not entirely clear from Flanders' submissions. In general, however, it appears that Flanders is premising his retaliation claim on the same string of events discussed in relation to his substantive due process claim – including Defendants' failure to issue the building permit, Dzugan's issuance of the non-traffic citations, Dzugan's failure to properly issue the demolition permit, Dzugan's issuance of the Order to Vacate, and Defendants' failure to "correct their errors." (*See* Amended Compl. ¶74.) Defendants contend that many of the alleged acts of retaliation cannot support a viable §1983 claim to the extent they occurred more than two years before the present lawsuit was filed. In addition, Defendants dispute that there is any causal connection between Flanders' protected activity and the alleged acts of retaliation.

The Court agrees that Flanders has failed to produce evidence of a triable issue of fact relative to retaliatory motive and/or causation. To begin, many of the adverse actions of which Flanders complains occurred *prior to* his protected activity, and therefore, they could not have

been retaliatory in nature. This would include Dzugan's refusal to accept hand-drawn sketches of the proposed addition, his refusal to issue a building permit without professional blueprints, his issuance of the stop-work order, his prosecution of Flanders relative to Citations #1, #2, and #3, and his failure to advise Flanders of his appeal rights.

Certain other aspects of Flanders' retaliation claim are non-actionable for a different reason. For example, Flanders cannot premise his claim on the Defendants' alleged failure to "correct[ ] their errors" (Amended Compl. ¶74), because "[a]llegations of inaction are insufficient to maintain a claim for retaliation." *Monn v. Gettysburg Area Sch. Dist.*, 553 F. App'x 120, 122 (3d Cir.), *cert. denied*, 135 S. Ct. 438 (2014); *see also Kaucher v. County of Bucks*, 455 F.3d 418, 433 n. 11 (3d Cir.2006) ("[F]ailures to act cannot form the basis of a valid § 1983 claim."); *L.H. v. Pittston Area Sch. Dist.*, No. CIV.A. 3:13-0788, --- F. Supp. 3d ---, 2015 WL 5286715, at *11 (M.D. Pa. Sept. 10, 2015) ("A failure to act on a complaint is generally not a retaliatory action because, in the typical retaliation claim, the plaintiff is complaining about an affirmative detriment following the exercise of protected activity.") (internal quotation marks and citation omitted). In addition, Flanders cannot maintain a successful retaliation claim based on Dzugan's issuance of the initial demolition permit which incorrectly bore the address of Flanders' residence because the record shows that this error was promptly remedied, at Flanders' request, by the issuance of a new permit bearing the correct address of Elf Appliance. (Defs.' Ex. J and K, Docket Nos. 104-10 and 104-11; Pl.'s Ex. A at ¶22, Docket No. 113.) Although Flanders has speculated that Dzugan's error was intentional, he has not pointed to any evidence in the record to support this conclusion and, in any event, such a minor event would not deter a person of ordinary firmness from exercising his or her constitutional rights. *See Dombrosky v. Stewart*, 555 F. App'x 195, 197 (3d Cir. 2014) ("[T]he key question in determining whether a

cognizable First Amendment claim has been stated is whether 'the alleged retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his First Amendment rights.'")(quoting *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006) and citing *Crawford–El v. Britton*, 523 U.S. 574, 589 n. 10 (1998)).

What we are left with, then, are the following potential acts of retaliation: (a) Dzugan's issuance of Citation #4; (b) Dzugan's issuance of the Order to Vacate, and (c) the Board's refusal to grant Flanders a variance. Accordingly, the Court must consider whether any of these events could reasonably be viewed by a fact-finder as causally related to Flanders' protected activity.

To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) (citing cases); *see also Buck Foston's New Brunswick, LLC v. Cahill*, Civil Action No. 11-03731(FLW), 2013 WL 5435289, at *15 (D.N.J. Sept. 27, 2013). In the absence of such proof, the plaintiff must show that from the "evidence gleaned from the record as a whole" the trier of the fact should infer causation. *DeFlaminis*, 480 F.3d at 267; *Buck Foston's New Brunswick*, 2013 WL 5435289, at *15. Notably, the Third Circuit Court of Appeals has admonished that:

> [a] court must be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in his individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate. Consequently, a putative plaintiff by engaging in protected activity might be able to insulate himself from actions adverse to him that a public actor should take. The point we make is not theoretical as we do not doubt that public actors are well aware that persons disappointed with official decisions and actions frequently bring litigation against the actors responsible for the decisions or actions in their individual capacities, and the actors surely would want to avoid such unpleasant events.8 Thus, it would be natural for a public actor to attempt to head off a putative plaintiff with the unwarranted expenditure of public funds. Courts by their

decisions should not encourage such activity and, by enforcing the requirement
that a plaintiff show causation in a retaliation case, can avoid doing so as they will
protect the public actor from unjustified litigation for his appropriate conduct. In
this regard we recognize that often public actors such as those in this case must
make a large number of decisions in charged atmospheres thereby inviting
litigation against themselves in which plaintiffs ask the courts to second guess the
actors' decisions.

*DeFlaminis*, 480 F.3d at 267-68.

In this case, the protected activity (i.e., Flanders' appeals to the Board and to the Court of

Common Pleas) occurred in January and February 2008, but the alleged retaliatory acts occurred

in 2011. Thus, no substantial temporal proximity exists as between the protected activity and the

allegedly retaliatory conduct as might suggest a causal connection.

In addition, Flanders has not demonstrated "a pattern of antagonism *coupled with timing*

*to establish a causal link*." *Buck Foston's New Brunswick LLC*, 2013 WL 5435289, at *15

(emphasis added). To establish causation under an "antagonism" theory, a plaintiff must show

"'actual antagonistic conduct or animus *in 'the intervening period' between the protected activity*

*and the retaliation*." *Id.* (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 512–13 (3d

Cir.2003) (emphasis added)). Although the record shows that Flanders and Dzugan had

numerous interactions between 2005 and 2011 concerning the status of the proposed addition,

Flanders has not adduced evidence showing that repeated, escalating incidents occurred with

Dzugan between January 28, 2008, when Flanders first appealed Dzugan's permit denial to the

Board (*see* Amended Compl. ¶ 30), and the next act of alleged retaliation, which was Dzugan's

issuance of Citation #4 on January 14, 2011. Nor has Flanders demonstrated a pattern of

antagonism between himself and any members serving on the Board of Appeals. *Cf. Marra v.*

*Phila. Housing Auth.*, 497 F.3d 286 (3d Cir. 2007) (pattern of antagonism was evidenced by a

series of escalating incidents between defendant and plaintiff including vandalization of

plaintiff's computer and exclusion from work meetings); *Woodson v. Scott Paper Co.*, 109 F.3d

913 (3d Cir.1997) (pattern of antagonism evidenced by gradual deterioration of relationship between plaintiff and defendant through a series of discrete interactions culminating in the alleged act of retaliation).

To be sure, the record shows that Dzugan's enforcement measures against Flanders "escalated" over time from: (i) the denial of a second building permit due to Flanders' failure to obtain professional blueprints, to (ii) a stop work order based on Flanders' failure to obtain the requisite building permit, to (iii) issuance of Citation #1 based on Flanders' undertaking construction without the necessary blueprints or building permit, followed by (iv) issuance of Citation #3 for Flanders' failure to submit blueprints within a court-established deadline, then (v) the December 8, 2010 letter granting Flanders thirty (30) additional days in which to obtain blue prints or demolish the addition, followed by (vi) issuance of Citation #4 for Flanders' failure to comply with the UCC within the prescribed 30-day period, and finally, (vii) the posting of an Order to Vacate. Notably, however, these actions by Dzugan spanned a five-year period, part of which *preceded* Flanders' constitutionally protected activity – a fact which cuts against any inference of retaliation. Other enforcement measures by Dzugan occurred in the time period: (i) after the Department of Labor and Industry had reprimanded him for initially waiving the UCC's permit requirement for the foundation of Flanders' addition, and (ii) after the Board's 2008 ruling that Flanders could not obtain a permit without blueprints, and (iii) after Magisterial District Judge Gerheim's conviction of Flanders on Citation #1 for building without a permit or blueprints. These contextual facts further undermine any inference that Dzugan's enforcement measures were retaliatory in nature. Finally, the Court notes that neither party has pointed to any remarks or comments by Dzugan that would suggest a retaliatory motive on his part.

Given these considerations, the Court is not persuaded that "causation" can reasonably be inferred based on "evidence gleaned from the record as a whole," *DeFlaminis,* 480 F.3d at 267, even when the evidence is viewed in the light most favorable to Flanders. Instead, the record in this case compels the conclusion that Dzugan's "escalation" in enforcement measures was borne not of retaliatory animus but of Flanders' persistent noncompliance with mandatory provisions of the UCC which Dzugan was obligated to enforce.

Flanders' arguments in support of his retaliation claim fail to persuade this Court that a genuinely disputed issue of fact exists relative to causation and/or retaliatory animus. With regard to his prosecutions by Dzugan, Flanders contends that "three of the four citations [i.e., Citations #2, #3, and #4] ... were issued without probable cause and in direct retaliation for Flanders' contesting the unfair action of the Defendants." (Pl.'s Mem. Opp. Mot. Summ. J. at 16, Docket No. 111.) As was previously noted, however, Citations #2 and #3 preceded Flanders' constitutionally protected activity, and therefore, they could not have been causally related to such activity.

Flanders' reliance on Citation #4 also is of no avail because he cannot demonstrate that Dzugan lacked probable cause to issue the citation. *See Chizmar v. Borough of Trafford*, 454 F. App'x 100 (3d Cir. 2011) (retaliatory prosecution claims require a plaintiff to show the absence of probable cause) (citing *Hartman v. Moore,* 547 U.S. 250, 265-66 (2006)). Probable cause exists when, "at the time of the arrest, the facts and circumstances within the officer's knowledge are 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" *United States v. Glasser,* 750 F.2d 1197, 1206 (3d Cir.1984) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). Here, it is undisputed that: (i) Citation #4 was premised on Flanders' violation of UCC Code §403.42a, which expressly required professionally drawn

blueprints in connection with a permit application (*see* Def.s' Ex. M, Docket No. 104-13); (ii) the Department had reprimanded Dzugan in 2007 for failing to enforce the permit requirement relative to the foundation of Flanders' addition; (iii) in 2008 the Board of Appeals had sustained Dzugan's denial of Flanders' permit request based on Flanders' failure to acquire the necessary blueprints; (iv) the Board's decision had been affirmed by both the Court of Common Pleas and Commonwealth Courts; (v) Flanders had previously been convicted for building without the requisite blueprints or permit in connection with Citation #1; (vi) Dzugan had specifically warned Flanders in his December 8, 2010 correspondence that he had thirty days in which to comply with the terms of the Code or face the possibility of being charged with a summary offense; and (vii) Flanders was convicted by Magisterial District Judge Gerheim on Citation #4. All of these factors compel the conclusion that Dzugan had probable cause to believe that Flanders was in violation of the UCC when he issued Citation #4.

In his brief in opposition to summary judgment, Flanders argues that "Dzugan was well aware at the time the Fourth Citation was issued that the building permit issue was already before the Appeals Board, and [he] issued the Fourth Citation solely to cover his own errors, harass Flanders, and to cause Flanders to incur legal fees and time away from his business." (Pl.'s Mem. Opp. Mot. Summ. J. at 28 (discussing probable cause in the context of Plaintiff's malicious prosecution claim).) Aside from being conclusory and unsupported by competent record evidence, this assertion is irrelevant because whether or not Dzugan knew at the time he issued Citation #4 that Flanders was seeking a variance hearing before the UCC Board of Appeals is immaterial to the probable cause analysis. As outlined above, the facts known to Dzugan at the time he issued Citation #4 supported an objectively reasonable belief that Flanders was in violation of the UCC.

Flanders points to the fact that he was charged in Citation #3 for a summary offense relative to his lack of blue prints and was subsequently found not guilty in the Court of Common Pleas. Critically, however, Flanders' "not guilty" judgment relative to Citation #3 occurred on February 1, 2011, *after* Dzugan had already issued Citation #4. Accordingly, it is irrelevant to the probable cause analysis that Flanders ultimately achieved a successful outcome relative to Citation #3. In light of the foregoing considerations, no reasonable fact-finder could conclude that Dzugan lacked probable cause to issue Citation #4. It follows that the record will not support an inference of a causal connection between Flanders' protected activity and Dzugan's prosecution of Flanders.

Similarly, the record does not support the conclusion that Dzugan issued the Order to Vacate as a means of retaliating against Flanders because of his actions in petitioning for redress. By its terms, the Order explained that Flanders had been issued a demolition permit for the unfinished addition but the permit had since expired due to Flanders' failure to engage in the authorized demolition work. As previously discussed, Dzugan deemed the structure unsafe because the addition served as the primary means of ingress and egress to the building, it lacked blueprints or building permits, there was an illegal occupancy, and the building itself was uncertified. (*See* Pl.'s Ex. Q, Docket No. 113; Dzugan Dep. at 74:6-17, Docket No. 130.) Although Flanders apparently believes that the Order to Vacate was overly broad and should have been expressly limited to the addition, he does not point to any evidence supporting the conclusion that Dzugan misapplied the provisions of the UCC in issuing the Order to Vacate. Moreover, any possible inference of retaliation based on the Order to Vacate is undermined by the fact that (in contravention of his official duties as a CBO) Dzugan never enforced the Order.

Flanders also bases his retaliation claim on the Borough's actions relative to his request for a variance. Flanders states in his affidavit that, through his counsel, he requested the variance for the construction of his addition, "yet the Borough refused to cooperate with my attempt to apply for the variance." (Pl.'s Ex. A at ¶18, Docket No. 113.) Flanders provides no further elaboration in his affidavit as to who, in particular, "refused to cooperate" with him, or how. In his Concise Statement of Material Facts ¶59 (Docket No. 112), Flanders references an August 27, 2010 letter from his attorney to the Borough's Solicitor, Frank Wolfe, which states:

> Mr. Flanders advises that he has sought, without success, to schedule a variance hearing as per the recent Commonwealth Court decision. He advises that Borough Council declines to do so.
>
> This letter is a demand that you or council provide Mr. Flanders with the appropriate form to request the variance and schedule a variance hearing. If Council does not do so within the next two weeks, I have been directed to file a mandamus action.

(Pl.'s Ex. R, Docket No. 113.) The letter does not elaborate on the actions that Flanders took in his pursuit of a hearing, nor does it provide any detail about which particular individuals "declined" Flanders' request, how the "declination" was manifested, or why Flanders' requests were refused. Mr. Wolfe testified that the August 27, 2010 letter "concern[ed] a variance request that [Flanders] made with Ford City Borough, and apparently no one gave him the forms to ask for that variance, and [Flanders' counsel] said if nothing was forthcoming, he would take some action." (Wolfe Dep. at 60:19-23.) Wolfe further explained that:

> the way the Borough is structured, ... the Zoning Hearing [B]oard hears the variances. The Zoning Hearing Board is a separate arm of the [B]orough. It has its own solicitor. I did speak with [Flanders' counsel] about this, and I said to him that, "I don't think you want to schedule a variance. Do you want to go as an appeal through the Uniform Construction Code, the [B]orough Board of Appeals?" Because I didn't see how a variance was going to mean anything. I didn't understand it, and he said he felt that was the way to proceed and I gave him the information, I believe, as [to] who the Zoning Board solicitor was and that person's phone number.

(Id. at 61:7-20.) Even with this explanation, however, it remains unclear as to whom within the Borough's administration Flanders dealt with and what exactly occurred. It is not clear, for example, whether Flanders had discussions with members of the Borough's Council or merely a lower level employee. At most, the record establishes that Flanders sought a variance hearing prior to August 27, 2010 and, for reasons that remain unclear, no hearing was scheduled until February 8, 2011. Without more detail as to the specific interactions that Flanders had with Borough officials, no reasonable inference can be drawn that the Borough acted with a retaliatory motive.

Flanders' evidentiary problems are compounded by the fact that the Board of Appeals, which presumably scheduled the variance hearing, is a body separate and distinct from the Borough's Council. Flanders has neither argued nor offered evidence to suggest that members of the Borough's administration were in contact with members of the Board of Appeals concerning efforts to hinder or delay a hearing on Flanders' variance request.

Flanders also bases his retaliation claim on the fact that his variance request was ultimately denied by the Board of Appeals, in contrast to the case of Peggy Bennett. In 2008, Ms. Bennett successfully obtained a variance on behalf of a daycare center which relieved the center from having to install a cost-prohibitive sprinkler system. (*See* Pl.'s Ex. GG, Docket No. 113.) According to Flanders, "[t]he Borough's treatment of the daycare center is in sharp contrast to the treatment of Flanders, who was denied relief at every step and prosecuted criminally." (Pl.'s Mem. Opp. Mot. Summ. J. at 16, Docket No. 111.) Flanders does not point to any aspect of Ms. Bennett's variance proceedings, or his own, that lend credence to the theory that his own protected First Amendment activities factored into the Board's decision to deny his variance. Moreover, any enforcement actions taken by Dzugan relative to Flanders' criminal

prosecution are not attributable to the Board and cannot constitute evidence of the Board's motive. Without more, the mere fact that Ms. Bennett's request for a variance was granted and Flanders' was not is insufficient to support a logical inference of retaliatory motive.

In conclusion, Flanders has failed to adduce evidence that could support a viable claim of retaliation under the First Amendment. Many of the Defendants' challenged actions concern events that occurred prior to Flanders' constitutionally protected activity. To the extent Flanders has alleged acts of alleged retaliation that post-dated his protected activity, these acts fail to support a logical inference of retaliatory motive, even when the record as a whole is viewed in the light most favorable to Flanders. Accordingly, summary judgment will be entered in Defendants' favor relative to the §1983 claim at Count III.

### 3. Equal Protection

Under the Equal Protection Clause of the Fourteenth Amendment, states are proscribed from denying "any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV §1. This proscription encompasses the discriminatory enforcement of a facially valid law. *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005).

In Count V of the Amended Complaint, Flanders alleges, under a "class of one" theory, that Defendants violated his equal protection rights by treating him differently from other similarly situated property owners. To prevail on an equal protection claim under a class of one theory, a plaintiff must show that he was "intentionally treated differently from others similarly situated and that there [was] no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *see also Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006). "To be 'similarly situated,' parties must be 'alike in all relevant aspects.'" *Perano v. Twp. of Tilden*, 423 F. App'x 234, 238 (3d Cir. 2011) (quoting *Startzell v.*

*City of Phila.*, 533 F.3d 183, 203 (3d Cir.2008)). In cases involving zoning or land-use disputes, courts consider "the similarity of the properties being compared, including their physical characteristics and their 'similarities in the eyes of a defendant.'" *Jeffers,* 2015 WL 4232662, at *3 (quoting *Hankin Family P'ship,* 2012 WL 43610, at *11).

Here, Flanders contends that Dzugan treated him differently from the owners of the following comparator properties: (1) Lerner Photography, (2) Jitterbug Java, (3) The Ford City Tax Office, (4) The Mantini Building, (5) Gregg's Garage, and (6) the Andrews' House.[13] Flanders maintains that, unlike in his case, Dzugan allowed the owners of these comparator properties to bypass the requirements of the UCC in various ways. Thus, Flanders assumes that he is "similarly situated" to any property owner as to whom the requirements of the UCC were not strictly enforced by Dzugan. In this Court's view, this definition of "similarly situated" comparators is too broad in that it fails to pinpoint the "relevant aspects" of Dzugan's administration and enforcement decisions *vis-a-vis* Elf Appliance.

---

[13] In his Supplemental Memorandum in Opposition to Defendants' Motion for Summary Judgment (Docket No. 139), Flanders cites, for the first time, Peggy Bennett's daycare center as an additional comparator property. As previously noted, Ms. Bennett was granted a variance from a code provision that would have required the installation of a sprinkler system in the daycare center. Because this variance was granted by the UCC Board of Appeals, not by Dzugan, the circumstances of Ms. Bennett's case do not support Flanders' "class of one" claim to the extent it is directed against Dzugan individually.

To the extent Flanders is citing Ms. Bennett as a comparator relative to his "class of one" claim against the Borough, the Court finds this comparator evidence insufficient as a matter of law to support a viable equal protection claim. In particular, Flanders has failed to demonstrate that Ms. Bennett's property and Elf Appliance were alike in all relevant aspects. The transcript of Ms. Bennett's proceedings before the Board reflects at least two reasons for the requested variance: first, the required sprinkler system presented a financial hardship to Ms. Bennett; second, the required system was technically unfeasible because the property lacked a water source that could supply the level of water pressure needed for the sprinkler system. (*See* Bd. of Appeals Tr. at 10:24-11:19, Pl.'s Ex. GG, Docket No. 113.) Securing the necessary water source from alternative sources was impracticable due to the presence of a state highway on one side of Ms. Bennett's property and the presence of an adjoining parcel on another side whose owner did not want to grant an easement for the purpose of running a water line across his property. (*Id.*) In addition, the transcript reflects that Ms. Bennett had undertaken alternative measures to ensure fire safety. (*See id.* at 11:13-12:10, 19:25-22:2.) Because Flanders has not shown that his case and Ms. Bennett's are alike in all relevant aspects, he cannot maintain a viable "class of one" claim against the Borough based on the Board's denial of his requested variance.

In Flanders' case, Dzugan's administrative and enforcement measures stemmed from his underlying determination that Flanders could not proceed with his proposed addition in the absence of a building permit, which in turn could not be issued in the absence of professionally drawn blueprints. Dzugan determined that professional blueprints were required because the proposed addition involved more than just "minor" construction due to "the structural loads to be determined," (Defs.' Ex. B, Docket No. 104-2), and because the proposed addition constituted a means of ingress and egress for Flanders' building. (Dzugan Dep. at 43-20-44:10.) Thus, the relevant consideration in Flanders' case was the fact that Flanders sought to undertake a construction project, involving more than "minor" work, at the entrance of his building without the benefit of professionally drawn blueprints, which was contrary to the requirements of the UCC.

Many of Flanders' proffered comparators are not similarly situated to him in this regard. For example, the Mantini Building and the Andrews' House both involved situations where a building permit was issued after the owners (unlike Flanders) actually submitted the required construction documents. (*See* Defs.' Ex. G, Docket No. 104-7 at pp. 10-16; Pl.'s Ex. EE at ¶¶64-67, Docket No. 113.)[14] Dzugan's involvement with the Ford City Tax Office was apparently limited to his issuance of a temporary certificate of occupancy. (*See* Defs.' Ex. H, Docket No. 104-8.) Defendants maintain that no construction was undertaken by the owners, and the record does not indicate otherwise.[15] Based on these considerations, no reasonable jury could find that the foregoing comparators and Flanders were alike in all relevant respects.

---

[14] The Court also notes that the Andrews' House was located in the Borough of Avonmore, located in Westmoreland County, Pennsylvania -- a jurisdiction separate and distinct from Ford City. In view of this fact, any actions taken by Dzugan in regards to the Andrews' House are not attributable to Dzugan in his capacity as a Ford City official and cannot constitute a violation of Flanders' equal protection rights.

[15] Flanders alleges in his supplemental brief that interior walls were added to the property in order to change its structure without proper permits or documents having been issued; however the record does not evidence this fact,

Dzugan's involvement with Gregg's Garage came about, not because of a permit application for new construction, but because of complaints about the dilapidated condition of the property. The record shows that no building permit applications were ever submitted and no construction was ever performed on the property. In response to these complaints, Dzugan wrote the owner, Gregory Dinko, in August 2010 and instructed him that the collapsing foundation of his property had become a safety issue and that the necessary repairs would require the assistance of an engineer or architect as well as a building permit. (Pl.'s Ex. T, Docket No. 113.) In October 2010, Dzugan sent Dinko a follow up letter advising that Dinko needed to provide a timeline for his intended repairs or he would be subject to enforcement of UCC §403.84, dealing with unsafe structures. (Pl.'s Ex. U, Docket No. 113.) The following month, Dzugan posted a notice on Dinko's front door requesting that he "aggressively maintain protective barriers and signs to curtain away the public from the front of the building." (Pl.'s Ex. V, Docket No. 113.) In June 2011, Dzugan issued a notice to Dinko advising that he was in violation of Borough Ordinance 521 (Nuisances-Unsafe Structures) and directing him to abate the nuisance within 90 days. (Defs.' Ex. E, Docket No. 104-5.) Subsequently, in November 2011, Dzugan issued a notice to vacate the property, followed by a non-traffic citation, based on Dinko's violation of Ordinance 521 and his failure to abate the nuisance. (*See* Pl.'s Ex. X, Docket No. 113.)

Flanders cites Dzugan's involvement with Gregg's Garage as evidence that Dinko was a "similarly situated" owner of an unsafe structure who received more lenient treatment from Dzugan, but the record cannot reasonably be viewed as supporting such an inference. Like Flanders, Dinko was ordered to remedy an unsafe situation; based on his failure to do so, Dzugan ultimately issued a citation to Dinko as well as a notice to vacate the building. Thus, the record

and Flanders cites no specific portion of the record to support his claim. (*See* Pl.'s Suppl. Mem. Opp. Defs.' Mot. Summ. J. at 11, Docket No. 139.)

reflects that Flanders and Dinko actually received similar treatment. Flanders nevertheless

objects that, unlike Dinko, he received "four (4) criminal citations, incorrectly issued permits,

stop work orders, inconsistent orders, and an Order to Vacate." (Pl.'s Mem. Opp. Defs.' Mot.

Summ. J. at 20, Docket No. 111.) However, this argument overlooks the following undisputed

facts:

- the stop-work order and Citations #1, #3, and #4 all related to Flanders' conduct in undertaking new construction without a permit or blueprints on file, after having been expressly advised of those prerequisites – conduct which did not occur in Dinko's case;

- Citation #2 involved Flanders' alleged violation of a sign ordinance; there is no evidence to suggest that the same violation existed but went un-redressed in Dinko's case;

- the "incorrectly issued" demolition permit was promptly remedied upon Flanders' request and did not result in any disparate application of the building code laws as against Flanders;

- the "inconsistent orders" from Dzugan concerning the need for professional blueprints in Flanders' case resulted from the fact that Dzugan believed he could approve Flanders' project in stages and further believed that the footer and foundation of the project were "minor" enough that they did not require blueprints (*see* Dzugan Dep. Ex.17, Docket No. 130 at pp. 167-68); this factual scenario did not present itself in Dinko's case; and

- Dzugan treated Flanders and Dinko similarly relative to the order to vacate in that both Flanders and Dinko received their orders only after a substantial period of noncompliance (five years in Flanders' case), and Dzugan never actually enforced the Order against either property.

In light of these myriad factual nuances, no reasonable fact-finder could conclude that Dinko was

treated more favorably than Flanders, despite being similarly situated in "all relevant respects."

At first blush, Flanders' reliance on Lerner Photography and Jitterbug Java presents a

closer question. Both situations involved the conversion of a former noncommercial building

into a commercial property that required approval of the necessary construction documents and

issuance of a building permit. In both cases, the Department of Labor & Industry faulted Dzugan

for, among other things, allowing the construction to occur without the owners having first acquired the necessary permits. (See generally CSMF ¶¶ 71, 77, 79, 81, 83, 98-99.) In the case of Lerner Photography, the Department also found that Dzugan failed to issue a stop work order when he knew or should have known that unpermitted construction was occurring. (*Id*. at ¶83.)[16]

On the other hand, however, if Flanders' "similarly situated" comparators are defined to include any commercial property owners who engaged in construction work that was subject to the UCC's blueprint and permitting requirements, then Flanders is not truly in a "class of one" by virtue of having had those requirements enforced against him. Dzugan testified that, under the terms of the UCC, commercial construction generally requires blueprints, and he cited a number of commercial projects in which he enforced the blueprint requirement. (Dzugan Dep. at 63:10-64:17, 66:4-20, 114:7-115:13, Dzugan Dep. Ex. 11, Docket No. 130.) It is also evident that the owners of the Mantini Building were subjected to, and complied with, the UCC's blueprint and permitting requirements. (Defs.' Ex. G, Docket No. 104-7.) In addition, the record demonstrates that Peggy Bennett was required to comply with provisions of the UCC, including the requirement that she obtain professionally drawn construction plans, in connection with the childcare facility for which she sought a variance. (*See* Hrg. Tr. at12:13-13:20, Pl.'s Ex. GG, Docket No. 113.) Accordingly, based on all of the foregoing considerations, this Court finds that Flanders has failed to adduce proof sufficient to establish all elements of his "class of one" claim.

In the alternative, however, even if Flanders could demonstrate a violation of his equal protection rights, the Court would find that Dzugan is entitled to the protections of qualified immunity relative to Flanders' "class of one" claim. "Qualified immunity shields federal and

---

[16] It is not clear from the record that either project involved the structural load considerations or ingress/egress concerns that ostensibly underlay Dzugan's permitting decision relative to Elf Appliance.

state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Michtavi v. Scism*, 808 F.3d 203, 206 (3d Cir. Oct. 19, 2015) (*Ashcroft v. al–Kidd*, 563 U.S. 731, 131 S.Ct. 2074, 2080 (2011)). "In determining whether a right has been clearly established, the court must define the right allegedly violated at the appropriate level of specificity." *Id.* (quoting *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir.2012) and citing *al–Kidd*, 131 S. Ct. at 2084). Courts are required to look to the specific conduct at issue to determine whether such conduct is clearly established as violative of a plaintiff's constitutional or statutory rights. *See Mullenix v. Luna*, —— U.S. ——, 136 S. Ct. 305, 308 (2015) (*per curiam*); *Michtavi*, 808 F.3d at 206. Accordingly, the appropriate inquiry is whether a reasonable official in the defendant's situation would know that, by engaging in the challenged conduct, he is violating the constitutional rights of another individual. *See Anderson v. Creighton,* 483 U.S. 635, 640 (1987) ("[T]he contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right."). In this vein, "[t]he doctrine aims to exclude the 'plainly incompetent' and 'those who knowingly violate the law' while accommodating reasonable 'mistaken judgments.'" *Johnson v. Knorr*, No. CIV.A. 01-CV-3418, 2003 WL 22657125, at *4 (E.D. Pa. Oct. 28, 2003) (quoting *Hunter v. Bryant*, 502 U.S. 223, 229 (1991)).

In this case, a reasonable official would not necessarily understand that Dzugan's conduct could amount to a violation of Flanders' equal protection rights. First, there is no genuine dispute that Dzugan correctly construed and applied the applicable provisions of the UCC insofar as he determined that Flanders' proposed addition required a building permit supported by

professional blueprints.[17]  *See* 34 Pa. Code §403.42(a) and (d) (2006); *id.* at §403.42a(b) and (c).

Second, it would not necessarily have been obvious to a reasonable building code official in

Dzugan's position that his actions vis-a-vis Flanders' comparators amounted to

unconstitutionally disparate treatment relative to Flanders.

The Third Circuit Court of Appeals has recognized that there is "little jurisprudence

discussing th[e] 'class of one' theory." *Phillips v. Cty. of Allegheny,* 515 F.3d 224, 243 (3d Cir.

2008); *see also Hill v. Borough of Kutztown,* 455 F.3d 225, 239 (3d Cir. 2006) (court recognizing

that it "has not had the opportunity to consider the equal protection 'class of one' theory at any

length").  Nevertheless, the district courts in this circuit have frequently followed the approach of

the Second Circuit Court of Appeals by requiring an "extremely high degree" of similarity

between the "class-of-one" plaintiff and his proffered comparators.  *See, e.g., Jeffers v. City of

Washington*, No. CIV.A. 14-1361, 2015 WL 4232662, at *3 (W.D. Pa. July 13, 2015) ("To make

out a class-of-one equal protection claim, 'plaintiffs must show an extremely high degree of

similarity between themselves and the persons to whom they compare themselves.'") (quoting

*Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006)); *Dombrosky v. Stewart*, No. CIV.A.

3:10-1477, 2012 WL 3686779, at *5 (M.D. Pa. Aug. 27, 2012) ("The Second Circuit has noted

that [the 'similarly situated' element] requires a 'class of one' plaintiff to 'show an extremely

high degree of similarity between themselves and the persons to who[m] they compare

themselves.'") (quoting *Hankin Family P'ship v. Upper Merion Twp.*, No. 01–1622, 2012 WL

43610, at *11 (E.D. Pa. Jan.6, 2012)).  "Determining whether an individual is 'similarly situated'

to another individual is a case-by-case fact-intensive inquiry."  *McLaughlin v. Forty Fort*

---

[17] The correctness of this determination is further supported by:  (a) the Department's April 24, 2007 letter to Dzugan admonishing him for having waived the permitting requirement in connection with Flanders' initial construction of the foundation and footer for his addition, and (b) the Board of Appeals' 2008 and 2011 rulings denying Flanders' requests for a permit and/or a variance.

*Borough*, 64 F. Supp. 3d 631, 647-48 (M.D. Pa. 2014) (internal quotation marks and citation omitted); *see also Borrell v. Bloomsburg Univ.*, 955 F. Supp. 2d 390, 405 (M.D.Pa.2013).

In this case, Flanders has not identified a single comparator that is similarly situated to himself in all relevant respects; instead, he has proffered comparators that, at best, are arguably similar in certain discrete respects.[18]  Moreover, he has not shown a pattern of conduct on Dzugan's part which supports an inference that he was intentionally singled out for adverse treatment based on considerations that are completely divorced from any legitimate governmental concern.  Accordingly, it would not have been clear to a reasonable official that Dzugan's conduct toward Flanders and the other aforementioned property owners violated Flanders' equal protection rights.  Dzugan is therefore entitled to the protection of qualified immunity to the extent he has established an equal protection violation.  Judgment will be entered in his favor with respect to the §1983 claim at Count V.

### 4.  *Municipal Liability*

Defendants have also moved for summary judgment on all §1983 claims directed against the Borough, arguing that there is no factual basis to support a finding of municipal liability.  Claims against a municipality under § 1983 cannot be based on principles of *respondeat superior,* but must be founded upon evidence that the government unit itself supported a violation of constitutional rights.  *Watson v. Abington Twp.*, 478 F.3d 144, 155 (3d Cir.2007) (*citing Monell v. New York City Department of Social Services*, 436 U.S. 658, 691–95 (1978)).

---

[18] The Second Circuit Court of Appeals recently considered, and approved, this approach to proving a "class of one" theory as a matter of first impression.  *See Fortress Bible Church v. Feiner*, 694 F.3d 208, 223 (2d Cir. 2012) (holding that, "where... the issues compared are discrete and not cumulative or affected by the character of the project as a whole, multiple comparators are sufficient so long as the issues being compared are so similar that differential treatment with regard to them cannot be explained by anything other than discrimination").  This decision is, of course, not binding within the Third Circuit and, moreover, it was rendered after the time period during which Dzugan engaged in the conduct now being challenged.  The Third Circuit Court of Appeals has not addressed the issue raised in *Fortress Bible Church*.

Municipal liability only attaches when the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694; *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir.1990).

Of course, it is axiomatic that, in order to establish a municipality's liability under §1983, a predicate constitutional violation must be shown to exist. *Zimmerlink v. Zapotsky*, 539 F. App'x 45, 50-51 (3d Cir. 2013) (where no §1983 claims against the individual defendants survived, municipal liability claims were properly dismissed) (citing *Williams v. West Chester*, 891 F.2d 458, 467 (3d Cir.1989)). Because Flanders has failed to adduce evidence sufficient to establish a predicate violation of his federal constitutional rights, it follows that he cannot hold the Borough liable under §1983.

Flanders' State Law Claims

Flanders has also asserted state law claims in this case. In Counts I, III, and IV respectively, he claims that Defendants violated his rights under Pennsylvania's constitution to substantive due process, to engage in constitutionally protected conduct free from retaliation, and to enjoy equal protection under the law. In Count VI, Flanders asserts a claim under Pennsylvania law for malicious prosecution.

In light of this Court's conclusion that the Defendants are entitled to summary judgment on each of their federal §1983 claims, the Court will decline to exercise continued supplemental jurisdiction over the state law claims. *See* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... (3) the district court has dismissed all claims over which it has original jurisdiction, ..."); *see also Tully v. Mott*, 540 F.2d 187, 196 (3d Cir.1976) ("If it appears that the federal claim [ ... ] could be disposed of on a

motion for summary judgment under F.R. Civ. P. 56, then the court should ordinarily refrain from exercising jurisdiction in the absence of extraordinary circumstances."). The decision in exercising supplemental jurisdiction "is committed to the sound discretion of the district court." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 444 (3d Cir.1997).

In this case, no concerns about judicial economy or fairness compel this Court to maintain supplemental jurisdiction over the remainder of this lawsuit. Although the state law claims in this action are factually related to the federal claims, Flanders' state law claims do not involve issues of federal policy and are better resolved in state court. Neither party will be significantly prejudiced by a dismissal of the state law claims without prejudice, because Pennsylvania has enacted a "savings statute," 42 Pa. Cons. Stat. Ann. § 5103, pursuant to which plaintiffs are permitted to file a certified transcript of federal proceedings in a state court and "the date of institution of the federal suit [serves] as the state court filing date for statute of limitations purposes, thereby obviating any limitations problems caused by dismissal." *Rashid v. Kite*, 957 F. Supp. 70, 75 (E.D. Pa. 1997); *see also Weaver v. Marine Bank*, 683 F.2d 744, 746 (3d Cir. 1982). In addition, discovery has been completed and the remaining claims are postured for an expeditious resolution in the Court of Common Pleas. Accordingly, this Court will decline to exercise supplemental jurisdiction over Flanders' remaining state law claims, and those claims will be dismissed without prejudice.

## V. CONCLUSION

Based on the foregoing, the Defendants' motion for summary judgment (Docket No. 102) will be granted, in part and denied, in part. The motion will be granted with respect to Plaintiff's federal claims under 42 U.S.C. §1983. The motion will be denied with respect to Plaintiff's

remaining state law claims, which will be dismissed, without prejudice, so that Plaintiff can litigate those claims in state court.  An appropriate Order follows.

Dated:  January 11, 2016                                    s/ *Nora Barry Fischer*
                                                            Nora Barry Fischer
                                                            United States District Judge


cc/ecf:  All counsel of record.